SIMONS *v.* McCORMICK..

1. BOUNDARIES—EJECTMENT—EVIDENCE—QUESTION FOR JURY.
    In ejectment proceedings, where the evidence as to the location of an old highway, determining the boundaries of a school house lot, was contradictory, the question was properly submitted to the jury.

2. ADVERSE POSSESSION—DEFINITION.
    Adverse possession, to give title, must be an actual, continued, visible, notorious, distinct, and hostile possession, and a finding of adverse possession must set forth in explicit terms a state of facts that will satisfy the legal definition.

3. SAME—EVIDENCE—INFERENCE—HOSTILE POSSESSION.
    The doctrine which sanctions the divestiture of the true owner by hostile occupancy is to be taken strictly, and the case is not to be made out by inference, but by clear and cogent proof.

4. SAME—EVIDENCE—INFERENCE—QUESTION FOR JURY.
    Where the open, notorious, and hostile possession of defendants was not clearly established by the evidence, but was left to inference, the court below was in error in submitting the question of adverse possession to the jury.

Error to Wayne; Mandell, J. Submitted June 11, 1918. (Docket No. 86.) Decided July 18, 1918.

Ejectment by David W. Simons against Frank E. McCormick and others. Judgment for defendants. Plaintiff brings error. Reversed.

*Albert McClatchey* (*Charles C. Simons,* of counsel), for appellant.

*George O. Tackles* (*Joseph B. Hendee,* of counsel), for appellees.

KUHN, J. The plaintiff is seeking to recover, in an action of ejectment, a certain parcel of land on Oak-

See notes in 15 L. R. A. (N. S.) 1189.

land avenue in the city of Detroit, of which he claims to be the lawful owner and entitled to possession, by virtue of the following conveyances. On May 30, 1865, Ralph Phelps, being the owner in fee of 80 acres of land described as the west ½ of quarter section 43 of the 10,000 acre tract, Wayne county, Michigan, sold and conveyed by warranty deed to school district No. 11 in the township of Hamtramck, Wayne county, a portion of said land described as,—

"Commencing at the intersection of the west line of quarter section forty-three (43), in the 10,000 acre tract, and the northerly line of a public highway known as the Holbrook ditch road; thence northwesterly along the said west line of said quarter section, six (6) rods; thence northeasterly on a line parallel with the north line of said public highway or road, five (5) rods; thence southeasterly on a line parallel with said west line aforesaid six (6) rods to said northerly line of said public highway or road; thence southwesterly along said northerly line of said highway or road five (5) rods to the place of beginning, containing thirty (30) square rods; the aforesaid parties of the first part do not sell, warrant or defend the improvements put upon said tract of land since taken possession of by said second party."

The school district apparently had taken possession of said land prior to the date of the deed, built a fence around it, and erected a school house on the land, facing the Holbrook ditch road.

The legal title to this property appears to have remained in the school district, and the building appears to have been used continuously as a district school house, until, by virtue of Act No. 324, Local Acts 1891, approved May 13, 1891, the portion of the township of Hamtramck in which the school house was located, became a part of the city of Detroit, and, by the provisions of section 9 of said act, the title to the school house lot vested in the board of education of the city of Detroit on July 1, 1892. The building was used as

one of the public schools of the city for some years thereafter, but a new school having then been erected on a different site in the neighborhood, the old building was torn down, and on September 12, 1907, the board of education of the city of Detroit, by warranty deed conveyed the old school house lot to the Hannan Realty Company by exactly the same description by which it was deeded by Ralph Phelps to the school district. On November 6, 1908, the Hannan Realty Company conveyed, by warranty deed, the north half of the premises to William J. Crake and Mary, his wife, by the following description:

"The north half (½) of the following described property: Commencing at the intersection of the west line of quarter section forty-three (43), in the 10,000 acre tract, and the northerly line of a public highway known as the Holbrook ditch road; thence northwesterly along the said west line of said quarter section, six (6) rods; thence northeasterly on a line parallel with the north line of said public highway or road, five (5) rods; thence southeasterly on a line parallel with said west line aforesaid six (6) rods to said northerly line of said public highway or road; thence southwesterly along said northerly line of said highway or road five (5) rods to the place of beginning,"

and on the same day conveyed the south half of the school house lot by a similar description to one Larraway, who conveyed to Julia Newell. Plaintiff acquired the north half of the school house lot by warranty deed from Crake and wife containing the same description as above quoted. When he went to look over his property, he found a shortage of about 33 feet in the north and south dimension of his lot. A frame store building had been erected on the portion claimed by Julia Newell under her deed, and to the north of plaintiff's lot was a double brick house. Plaintiff first brought ejectment against Julia Newell, but the court having directed a verdict in her favor,

plaintiff is now proceeding on the theory that the owner of the property to the north has encroached upon his land.

About a year after the conveyance of the school house lot to the school district, Ralph Phelps subdivided the remainder of said west ½ of quarter section 43, and the plat of his subdivision was recorded April 20, 1866, in Liber 1, page 65, of plats. This plat shows the school house lot, 99 by 82.5 feet, in the southwest corner of lot 4 of said subdivision. The south line of lot 4 and of the school house lot is shown to be the north line of the Holbrook ditch road. On the plat the width of this road is not indicated by figures, but the width of an intersecting road is marked 66 feet, and the two roads are represented as being of exactly the same width. The ditch from which the road took its name is shown on the plat as located within the highway limits and on the southerly side of the road.

On April 21, 1866, Ralph Phelps and wife conveyed lots 3 and 4 of his subdivision (and other lots) to Frederick Baisch, and on August 5, 1873, Frederick Baisch and wife conveyed the same lots to Amos Crowton. On December 3, 1889, Amos Crowton sold, on land contract, to James Galloway and James D. Butterfield lots 3 and 4 of the said Phelps subdivision, excepting therefrom the school house lot in the southwest corner of said lot 4. During the same month Galloway and Butterfield subdivided said lots 3 and 4, and a plat of their subdivision was recorded December 26, 1889, in Liber 13, page 59, of plats. This plat was made on the theory that the south line of said lots 3 and 4 was the center line of Holbrook avenue as it existed at the date of said plat (the street being then 66 feet wide), and shows the school house lot as only 66 feet in length from the north line of Holbrook avenue. It also shows 33 feet taken off the westerly side

of said lot for the opening of Oakland avenue, leaving the width of the lot 49.5 feet.

The respective interests of Galloway and Butterfield under the land contract were eventually acquired by one Daniel J. Smith (Mr. Butterfield's father-in-law) and, after various proceedings in the probate court in the matter of the estate of Amos Crowton, who had deceased in the meantime, the Crowton interest was finally deeded to said Smith.

The school house lot, as represented on Galloway & Butterfield's plat, adjoins on the south lot 24 of said subdivision and occupies the space between lot 24 and Holbrook avenue. Lot 24 is shown as being of equal width with the school house lot and extending northerly therefrom 57.06 feet to an alley. Lot 24 remained vacant and unsold until about August 6, 1906. On this date one Walter Preston took out a building permit for the erection of a double house thereon, and on September 3, 1906, Daniel J. Smith and wife conveyed the lot to Preston by warranty deed, under the description of "the northerly 57.06 feet of lot 24," etc. A quitclaim deed by Smith to Preston on September 26, 1906, describes it as lot 24. Immediately after taking out the building permit, Preston erected the double house now on the premises. Some further conveyances follow, all of which describe the property as the "northerly 57 feet of lot 24," but eventually the title vested, by foreclosure of a mortgage, in the Springport State Savings Bank of Springport, Jackson county, Michigan. The bank then took a quitclaim deed from Preston and wife describing the property as "lot 24." The bank conveyed lot 24 to Mathew A. Krausman, Jr., and Ida, his wife, two of the defendants herein. The defendant Frank E. McCormick was the occupant of the premises at the time this suit was started.

It is the claim of defendants that lot 24 does not

overlap the old school house lot, but that the missing 33 feet was taken off from the front of the school house lot in widening, or changing the location of, the old Holbrook ditch road. They make the further claim that, even if lot 24 does encroach upon the school house lot, they have acquired title to the portion occupied by them by adverse possession for the statutory period. On the trial in the circuit court, the jury found in favor of the defendants, and a motion for a new trial was denied.

Plaintiff's showing as to the size and location of the school house lot was as follows: The Phelps plat, made after the lot was conveyed to the school district and after the school house was built and the lot fenced, showed the Holbrook ditch road 66 feet wide, with the ditch occupying the southerly portion of this width, and showed the lot in question as extending 99 feet northerly from the north line of this highway. Mr. Jerome, a surveyor and civil engineer, who was connected with the city engineer's office at the time Holbrook avenue was paved in 1906 and conducted the paving operations, testified that the paved portion of the street extended part way over the old ditch, the south curb being at about the center of the ditch; that they had to fill in the ditch as they went along. Holbrook avenue is 66 feet wide. In order to show the length of the school house lot at the time of the Galloway & Butterfield plat, plaintiff produced several witnesses who testified to measurements and distances tending to support his claim that the lot was 99 feet long at that time, and even later.

The defendants' evidence to show that the location of the old Holbrook ditch road and the present Holbrook avenue differed, consisted of, *first*, the plat of Galloway & Butterfield's subdivision, which shows the north line of Holbrook avenue as 33 feet north of the original south line of the school house lot and of lots

3 and 4 of the Phelps subdivision; *second,* the testimony of Mason L. Brown, surveyor and civil engineer, who made the survey and plat of said subdivision; *third,* certain testimony as to the location of the fence along the rear of the school house lot.

The principal contention of appellant is that the court should have directed a verdict in his favor, for the alleged reasons,—

(1) That there was no question for the jury as to the location of the north line of the Holbrook ditch road, but that it was shown beyond controversy that Holbrook avenue and the Holbrook ditch road were one and the same.

(2) That defendants failed to show sufficient evidence of adverse possession to warrant the submission of that question to the jury.

1. Were the defendants entitled to go to the jury on the question of the location of the old Holbrook ditch road? After a careful study of all the testimony, it is our conclusion that the court did not err in submitting this question to the jury. While the testimony offered by the defendants on this point is somewhat weak and unsatisfactory, we do not think the court would have been justified in disregarding it altogether. Notwithstanding the fact that the testimony of plaintiff's witnesses as to the location of the pavement of the present Holbrook avenue with reference to the old ditch, when considered in comparison with the showing of the Phelps plat as to the location of the ditch and the width of the road, seems to support the contention that the city street coincided with the old township highway, sufficient doubt and uncertainty has nevertheless been thrown upon the matter by defendants' evidence to require the submission of the question to the jury. We think that the plat of Galloway & Butterfield's subdivision, taken in connection with the testimony of Mr. Brown, who made it, fairly raises a question. Mr. Brown testified, in part, as follows:

"I made the survey of what is now known as the Galloway & Butterfield subdivision. I made the plat that appears in liber 13, page 59. There is reserved from this plat a lot at the southwesterly corner having a dimension of 66 feet north and south and 82.50 feet east and west, measuring from the center line of Oakland avenue, that was what was known as the school house lot in that neighborhood.

"*Q.* Where did you drive your stakes for marking the southerly line of the lots which front on the north side of Holbrook avenue?

"*A.* On the north side of Holbrook avenue as laid out.

"*Q.* As laid out by whom?

"*A.* As laid out by that plat.

"*Q.* Are you acquainted with what used to be known as Holbrook ditch road?

"*A.* Why, yes, more or less, I thought I was.

"*Q.* What do you say the Holbrook ditch road and the Holbrook avenue was one and the same?

"*A.* It was my opinion that they were not.

"*Q.* On what did you base your opinion?

"*A.* By the location of the old school house fence and by the fact that the ditch was on the side of the road.

"*Q.* And according to your understanding and measurements what was the relative location of the north line of the Holbrook ditch road and the north line of Holbrook avenue?

"*A.* Well, I can only give you an opinion, my opinion on it as indicated by the lines of the traveled roadway, they were not the same.

"*Q.* To what extent were they not the same?

"*A.* Approximately 30 feet.   *   *   *

"*Q.* You have not any other thing to base your statement that the north line of Holbrook ditch road and the north line of Holbrook avenue were other than the same, except purely an opinion?

"*A.* That as I have already stated owing to the fact that there was a fence on the line.

"*Q.* When you platted the Galloway & Butterfield subdivision, you, of course, knew that there were 99 feet or six rods in the school house lot?

"*A.* I presume I did from the abstract.

"Q. You figured the 99 feet beginning from the middle of what is the Holbrook avenue?

"A. No, I figured it beginning from the north side of the Holbrook ditch road.

"Q. That is your line in the middle of the Holbrook avenue?

"A. That is what I construed it and where it was and where the fence showed it at that time."

In our opinion, the fair inference to be drawn from his statement as to fixing the location of the old highway by the location of the school house fence is that he found that measuring 99 feet from the rear fence of the school house lot brought him to the middle of Holbrook avenue as it then existed, and this is what his plat shows. It is true that he does not say the *rear* fence, but it is obvious that he could not have referred to the front fence, for his statement would then amount to this, that the front fence of the school house lot was in the middle of Holbrook avenue.

There was some testimony also that there existed, as late as 1909, the remnants of an old board fence a short distance south of the brick house constructed by Preston on lot 24 and in about the place where defendants claim the rear fence of the school house lot stood. While the effect of this testimony is somewhat uncertain, in view of the fact that all the witnesses on either side who claimed to have been familiar with the old school house property seemed to agree that the school house fence had entirely disappeared before the Preston house was built, and the witnesses who claimed to have seen this remnant of a fence were unable to identify it with the school house fence, having never seen the place before, still in our opinion it had some weight as evidence tending to support the defendants' theory as to the location of the rear line of the school house lot.

2. In the consideration of whether, under the evidence in this case, the court erred in submitting the

question of adverse possession to the jury, there should be borne in mind a fundamental rule which early received the sanction of this court. It was said in *Yelverton* v. *Steele,* 40 Mich. 541:

"The doctrine which sanctions the divestiture of the true owner by hostile occupancy is to be taken strictly, and the case is not to be made out by inference, but by clear and cogent proof."

Again, in *Paldi* v. *Paldi,* 95 Mich. 410, this court said:

"Adverse possession, to give title, must be an actual, continued, visible, notorious, distinct, and hostile possession, and a finding of adverse possession must set forth in explicit terms a state of facts that will satisfy the legal definition."

It is the claim of the defendants that the testimony showed that Amos Crowton had the land from 1873 and used it as a farm as far as the north school house fence until 1889, when he sold it to Galloway & Butterfield. Both Butterfield and Smith, who was the subsequent owner of the Galloway & Butterfield subdivision, said that they never took possession of any land nor made any use of it, but merely let it lie as vacant lots from 1889 to 1906, 17 years, and unless this occupancy by them for the period of 17 years satisfies the requirements of the rule to establish adverse possession, the possession begun by Crowton was not continuous, and there was no further adverse possession until Smith transferred the title to Preston, who built on the lot in 1906. From 1906 until the commencement of the suit was less than 11 years, which period would not be sufficient to establish the title by adverse possession. So that unless it can be found that the mere platting and subdividing of the property by Galloway & Butterfield is sufficient to satisfy the requirements of the rule, the court erred in submitting this

theory of the defendants to the jury. Counsel for the defendants say in their brief:

"Every real estate man with a subdivision sees to it that his ownership, possession and control of the subdivision is the most notorious thing apparent in the vicinity. It is safe to infer that if there was a subdivision, there was open and notorious possession of it. The signs and corner stakes of the boundaries of the lots, streets and alleys of a subdivision are evidence enough of that."

It may be true that if testimony had been introduced to show that Galloway & Butterfield went onto the property, staked it, placed signs on it, and actually occupied it, such testimony might have been sufficient evidence of open, notorious, and hostile possession to raise a question for the jury, but the infirmity of the defendants' case is that these facts were not established, and counsel ask that they should be inferred. As we have before stated, a case of adverse possession cannot be made out by inferences, but must be established by clear and cogent proof. This, in our opinion, the defendants have clearly failed to do, and there being an absence of proof of an actual, continuous, visible, notorious, distinct, and hostile possession for the statutory period, the court was in error in submitting this theory to the jury. It being impossible to determine which of defendants' theories the jury accepted in rendering its verdict, it will be necessary to reverse the case and order a new trial. It is so ordered, with costs to the plaintiff.

OSTRANDER, C. J., and BIRD, MOORE, STEERE, BROOKE, FELLOWS, and STONE, JJ., concurred.